# In the United States Court of Federal Claims

No. 25–2033C
(Filed: May 29, 2026)
(Re-issued: July 29, 2026)[1]

* * * * * * * * * * * * * * * * * * * * * * * * * * *

ASET PARTNERS CORP.,

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant*,

and

CFOCUS SOFTWARE INCORPORATED,

*Intervenor.*

* * * * * * * * * * * * * * * * * * * * * * * * * * *

*Daniel J. Strouse*, Arlington, VA, for plaintiff.

*Rebecca T. Mitchell*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Brett A. Shumate*, Assistant Attorney General, *Patricia McCarthy*, Director, *Douglas K. Mickle*, Acting Deputy Director. *Victoria R. Roth*, Senior Attorney for Acquisition and Procurement Law, Department of Homeland Security, of counsel.

*John R. Tolle*, McLean, VA, for intervenor.

---

[1] Pursuant to the Protective Order entered in this case, this opinion was originally filed under seal to afford the parties an opportunity to propose any appropriate redactions. They have done so. *See* ECF No. 54. Redactions are indicated by asterisks.

OPINION

*Bruggink*, Judge

Plaintiff ASET Partners Corp. ("ASET") brought this bid protest challenging defendant's decision, acting through the Department of Homeland Security ("DHS"), to award a contract to intervenor cFocus Software Incorporated ("CSI" or "cFocus"). All parties filed motions for judgment on the administrative record, and oral argument was held on April 10, 2026. Shortly after oral argument, plaintiff's motion for judgment on the administrative record was denied; defendant and intervenor's respective motions were granted. Order of April 10, 2026 (ECF No. 50). We more thoroughly explain our reasons below.

BACKGROUND[2]

I. The Solicitation

On July 11, 2025, DHS's Geospatial Management Office DHS issued Solicitation 70RTACQ00000044, a request for quote ("RFQ"). Administrative Record ("AR") Tab 18, 302–07. The successful bidder was to provide critical support to DHS through enterprise geospatial capabilities; it would ensure public safety and national security through incident monitoring, resource deployment tracking, and emerging threat assessment. AR Tab 8, 275; Tab 33, 717–18. This work is termed Geospatial Capabilities and Infrastructure Support 3.0. AR Tab 18, 302–07. The proposed contract was to be for one year (finishing in September 2026) with two option years thereafter. AR Tab 20b, 436.

The RFQ included a Statement of Work ("SOW") and Instructions to Quoters. AR Tabs 18a, 19b, 20b (SOW); Tabs 18b, 19c, 20c (Instructions to Quoters). The SOW laid out four task areas germane to our discussion: (1) Enterprise and Technical Architecture Support; (2) Geospatial Information Technology Management and Support; (3) Project Management and Agile Methodologies; and (4) Surge Support (optional). AR Tab 20 407–08. The SOW also included staffing requirements. It listed four key positions: (1) Project Manager; (2) Scrum Master; (3) System Architect; and (4) Information System Security Officer ("ISSO"). AR Tab 20b 439–41. The Solicitation suggested hourly rates for different labor categories, AR Tab

[2] These facts are drawn from the Administrative Record.

19e, 406, and each quoter could "determine the appropriate personnel mix to accomplish the outlined tasks in the SOW," AR Tab 20a, 409.

The Instructions to Quoters required that a Technical Quote be included in each submission. The Technical Quote (also referred to as Volume 1), outlines three factors for review: Factor 1 – Technical Approach; Factor 2 – Management Approach; and Factor 3 – Experience and Qualifications of Key Personnel (Resumes). AR Tab 20c, 445–48.[3] These three factors were equal in importance and in aggregate were weightier than price. *Id.* at 449–50. Each of the three Factors have constituent sub-factors.

Three sub-factors of Factor 1 are relevant. Quotes were required to address:

> 1.1 A technical approach that demonstrates experience with architecting and implementing custom applications.
>
> 1.2 Demonstrated experience in implementing geospatial solutions in an [Amazon Web Services ("AWS")] cloud environment including development and blue-green environments.
>
> 1.6 Demonstrated ability to use agile methodologies for multiple teams including utilization of collaboration tools such as JIRA, Confluence, Microsoft Teams, SharePoint, and Service Now.

AR Tab 20c, 446–47.

Sub-factors 1.2 and 1.6 include technical terms that require further explanation. In sub-factor 1.2, the word 'environment' refers to the behind-the-scenes portion of a webpage. A blue-green environment permits software developers to gradually implement changes without shutting down a website or service through parallel virtual systems. AR Tab 22a, 502. At any given moment, only the "blue" or "green" environment handles user requests, while the other version undergoes development updates. *Id.* Traffic is switched seamlessly (in theory) between the two, allowing incremental changes without interruption. *Id.* Sub-factor 1.6's reference to Agile

[3] The Instructions for Quoters also required a Price (Volume 2). AR 20c, 445–48.

methodologies alludes to methods of working. Agile methods include stand-up meetings, intense but short timelines (referred to as "sprints"), and user-story based design. AR Tab 21a, 472; *see also* AR Tab 22a, 507.

The relevant sub-factor for Factor 2 tasked bidders to demonstrate their management approach. Quoters needed to show an "ability to resource all positions at the time of contract award through (a) current employment of the proposed staff, (b) submission of Letters of Commitment for contingency hires . . . and/or (c) has comparable commitments in place with subcontractors." AR Tab 20c, 447.

Factor 3 (Experience and Qualifications of Key Personnel) had three sub-factors, all of which are relevant here.

> 3.1 The Government will evaluate confidence in the Offeror's qualifications and labor categories for each task in the SOW. The quoter shall identify the role for which the personnel are proposed. The quoter shall include the resume of each Key Personnel member proposed (only resumes for Key Personnel will be accepted).
>
> 3.2 The Government will evaluate confidence in the Offerors' proposed Staffing Plan and if the proposed staff has sufficient skill sets and relevant experience to successfully complete each task in the SOW with the number of hours by labor category. The Staffing Plan shall identify and describe all staffing resources and roles required to support the DHS geospatial capabilities and GII platform. This plan shall be informed by knowledge transfer and handoff of current DHS GII operations and maintenance provided by the legacy contractor teams as referenced in this SOW. This plan shall be delivered to the Government thirty (30) days after award.
>
> 3.3 The Government will evaluate confidence in the Offeror's proposed key personnel staff and if they have sufficient skill sets, based on provided resumes, to successfully complete the tasks in the SOW.

*Id*. at 447–48.

Of note, there are two staffing plans referred to in the Solicitation: a bidding staffing plan (referenced in sub-factor 3.2 above) and the awardee staffing plan (described below as a SOW deliverable). The bidding staffing plan submitted with each quote needed to include the number of staff, grouped by labor category. AR Tab 19a, 360 (questions 3 and 12). On the other hand, the awardee staffing plan required the name of each person performing work. *Id.*

The Solicitation contemplated an award based upon value rather than lowest price. The bidder who "provides the best value to the Government, considering technical evaluation factors and price" would win. AR Tab 20c, 450. DHS could select a more expensive bid if the quote provided a "superior technical solution, or [a] solution indicating a reduced performance risk, warrant[ing] a price premium." *Id.* Once a bidder was deemed "best suited (i.e., the apparent successful awardee), the government reserve[d] the right to communicate with only that quoter to address any remaining issues, if necessary, and finalize the resultant award." *Id.* DHS could communicate with the presumptive awardee regarding "technical and price" issues. *Id.* Discussions with offerors were not otherwise contemplated.

The bids were evaluated by two teams—the technical evaluation team ("TET") and the business evaluation team ("BET"). AR Tab 25, 669 (TET); AR Tab 20c, 448–49 (BET). The TET was to review the technical volume of each quote, pen a report, and rate every bid on each of the three factors. AR Tab 25, 670. The three possible ratings were "high confidence," "some confidence," and "low confidence." AR Tab 27, 685. Based upon the sub-factors, the TET would list elements of each bid that increased or decreased confidence in the bidder's ability to perform. AR Tab 27, 677. The BET, composed of the Contracting Officer ("CO") and a contract specialist, were to evaluate if the total price was fair and reasonable. AR Tab 20c, 446–49.

Quotes were required by August 4, 2025. After the TET and BET concluded their respective analyses, the best value contract could be determined. DHS was required to issue an award before the expiration of funds at the end of the Fiscal year on September 30, 2025. Once an awardee was chosen, DHS was required to gain Secretary approval.

II. The Bids

On August 4, 2025, DHS received proposals from three bidders: CSI, ASET, and *********, a non-party. Although an awardee had not yet been selected, on August 11, 2025, DHS prophylactically requested Secretary approval because of the relatively short time between quote submission and the decision deadline. AR Tab 33, 717. The acting undersecretary requested approval for $11,955,555.74 (the highest price of the three quoters). *Id.* Because this occurred before the end of the evaluation process, the agency left the awardee name "[t]o be determined." *Id.* at 719. On September 15, 2025, the Secretary of DHS approved the amount requested. *Id.*

While waiting for the Secretary's approval, the bid evaluations continued. The TET concluded its review and submitted its report to the CO on September 9, 2025. AR Tab 27, 686. It rated ********* with "some confidence" for Factors 1 and 2, but with "low confidence" for Factor 3. *Id.* at 682–84. CSI received "high confidence" ratings for all three factors. *Id.* at 676–78. ASET received a "high confidence" rating only for Factor 1. For Factors 2 and 3, the TET gave CSI "some confidence." *Id.* at 679–82. As a result, the TET recommended CSI for the award. *Id.* at 676. After examining the price volumes, and finding them to be fair and reasonable, the BET determined that CSI's quote provided the best value, AR Tab 28, 699. The agency thus selected CSI because it concluded that CSI's technical superiority warranted a price premium. AR Tab 30, 712–14.

Prior to making that award, on September 25, 2025, the CO had received suggested changes from agency staff with respect to her source selection, pricing evaluation, and best value memoranda, but was unable to finish revisions to those memoranda incorporating those suggestions before the September 30th deadline. *See, e.g.* AR Tab 59, 902; AR Tab 62, 912. The CO, therefore, officially awarded CSI the contract on September 29, 2025, and the company immediately began performance. AR Tab 35, 723–24.

On September 30, 2025, ASET gave the government a notice of intent to file a bid protest before this court. The following day, appropriations for the Federal Government lapsed, but work continued on the contract because DHS deemed the work "essential." AR Tab 8, 275. In addition, the CO revised the source selection, pricing evaluation, and best value memoranda, AR Tab 59, 90, "[a]s part of the quality control process that often occurs once the fiscal year ends." AR Tab 60, 903–08; AR Tab 62, 912–13. This process concluded on October 31, 2025, with a memo detailing the revisions made

post-award. AR Tab 62, 914. Despite these revisions, *see, e.g.*, AR Tabs 54–56, she concluded that they did not call for a different award decision. AR Tab 59, 902.

III. Key Personnel Changes

The SOW contains a table of required deliverables including a staffing plan. AR Tab 20b, 433. The eventual awardee was required to submit this plan thirty days after award. *Id.* The contract stipulated that, if the contractor wished to substitute any key personnel, the contractor had to give fifteen business days' advance notice to DHS. *Id.* at 439. The SOW incorporates Homeland Security Acquisition Regulation 3052.215-70. AR Tab 19d, 404. Under that regulation, the request needed to include a justification, names of the personnel involved, qualifications for proposed replacements, and had to be in writing. AR Tab 20b, 439. Contractors could only substitute with approval from the CO and proposed personnel had to "possess qualifications equal to or superior to those of the key person being replaced, unless otherwise approved by the [CO]." *Id.*

After award, but during the previously described "quality control" process, CSI submitted two sets of requests to substitute certain of its key personnel. AR Tab 49, 820–27. CSI sought approval to bring in ************ as Scrum Master. A Scrum Master is responsible for leading daily "stand-up meetings and coordinat[ing] Agile ceremonies including sprint planning, reviews and retrospectives." AR Tab 22a, 509; *see also* AR Tab 21a, 476. ******** had originally been included by ASET for the same role in its proposal. *Compare* AR Tab 49, 820, 826–27, *with* AR Tab 21a, 477, 480–81. CSI also sought to substitute the persons it had initially proposed for the ISSO, Project Manager, and Systems Architect positions. The CO approved the changes on December 16, 2025. AR Tab 53, 851.

Before the conclusion of the "quality control" process, on October 22, 2025, ASET filed a second Pre-Filing Notification of its intent to file a protest. At defendant's request, plaintiff provided the government with a draft complaint of its prospective bid protest on October 27, 2025. This prompted DHS to reevaluate the award, which kept plaintiff from filing its complaint until after that process concluded. Work was not halted during this process, however, and CSI continued performance of the contract. *See, e.g.*, AR Tab 8, 275; AR Tab 33, 717–18. The reevaluation ended November 5,

2025, and concluded with a reaffirmance of the award to CSI.[4] AR Tab 69, 969–70.

On November 28, 2025, ASET filed the pending bid protest. Complaint 1 (ECF No. 1). In Counts I and V, plaintiff alleges that DHS arbitrarily and capriciously evaluated the credentials of ASET and CSI's proposed staff under Factor 3. *Id.* at 6, 17. In Counts II and IV, ASET argues that DHS' evaluation under Factor 2 was arbitrary and capricious because it evaluated CSI's and ASET's staffing plans under different standards. *Id.* at 12, 16. In Count III, plaintiff contends DHS arbitrarily and capriciously overlooked CSI's inexperience, contrary to the Solicitations' requirements. *Id.* at 15. Plaintiff seeks an injunction against continued performance and a new evaluation and award decision. On February 3, 2026, ASET moved for judgment on the administrative record. Defendant and intervenor cross-moved on February 24, 2026.

## DISCUSSION

We evaluate bid protests under the standards set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4). An agency's decision will be set aside if its actions are arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. *See* 5 U.S.C. § 706; *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004). An action is arbitrary, capricious, contrary to law, or an abuse of discretion if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the action] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.–Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "In applying the APA standard of review, this Court affords considerable deference to an agency's procurement decisions." *Ekagra Partners, LLC v. United States*, 163 Fed. Cl. 189 (2022) (quotations omitted). "[I]n the post-award context, the protester must show that there was a substantial chance it would have received the contract award but for that error." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996).

---

[4] We use the term "reevaluation" advisedly. The CO used the term "new award decision," but the original award was never vacated.

Under Rule 52.1 of this court, we make "factual findings . . . from the record evidence as if [we] were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). When determining a motion on the administrative record, "the Court must make fact findings where necessary." *Baird v. United States*, 77 Fed. Cl. 114, 116 (2007). We consider four factors when deciding whether to issue an injunction: "(1) whether plaintiff has succeeded on the merits of the case; (2) whether plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *KGJJ Eng'g Solutions, LLC, v. United States*, 161 Fed. Cl. 556, 569 (2022).

I. Did DHS Err In Evaluating CSI's Technical Approach?

Plaintiff contends that DHS improperly evaluated the experience and qualifications of CSI's key personnel. ASET argues that CSI failed to demonstrate experience in three of the six sub-factors for Factor 1, Technical Approach.

Under sub-factor 1.1, bidders had to propose a technical approach demonstrating "experience with architecting and implementing custom applications and configuring geospatial, solutions, including automation testing." AR Tab 20c, 446. Plaintiff argues that CSI did not show any experience in software architecture or automation testing. ASET points to language from CSI's proposal in which the company only presented a plan of what it would do prospectively, not what its prior experience had been. *See* AR Tab 22a. We disagree.

CSI addressed sub-factor 1.1 with over a page of its proposal. While its proposal spends only one paragraph explicitly describing experience under the sub-factor,[5] the entire proposal is written in the present tense in terms of what it currently does: "we develop," "[w]e emphasize," "[w]e implement," "our team has deep expertise," "[w]e perform," "we conduct load and performance testing . . . to determine," "[w]e simulate real-world

[5] CSI explained that its experience "developing a custom situational awareness GIS application for U.S Army North (ARNORTH) taught [it] how to rapidly deliver new geospatial capabilities under tight timelines without compromising quality." AR Tab 22a, 501.

demand . . . and tune our applications," "[w]e track . . . ." AR Tab 22a, 502. Sub-factor 1.1 does not preclude the agency from inferring experience via a bidder's detailed, task-oriented approach to what it currently does as well as what it proposes to continue to do. When technical proposals are evaluated, we give "greater deference than usual" to an agency. *Red Cedar Harmonia, LLC v. United States*, 176 Fed. Cl. 409, 422 (2025) (quoting *E. W. Bliss Co.*, 77 F.3d at 449). We find no irrationality in the inferences drawn by the agency in CSI's favor in this regard.[6]

Plaintiff's second issue under Factor 1 revolves around blue-green environments. The Solicitation instructs bidders to "[d]emonstrate[] experience in implementing" these environments AR Tab 20c, 446. CSI outlined its proposed approach to blue-green environments in some detail, stating that it

> appl[ies] this approach to geospatial systems, for instance by staging updates of an ArcGIS Enterprise stack on a parallel [or blue-green] environment. When a new version or configuration is ready and tested, we cut over the traffic via AWS Application Load Balancers or Route 53 DNS switching, with no perceptible downtime to users. AWS's on-demand provisioning makes blue-green feasible even for complex systems, as we can script the instantiation of the full stack, run automated tests, and then tear down the old stack, paying only for the transition period.

AR Tab 22a, 502. As with its attempt to satisfy the requirement of sub-factor 1.1, CSI responded to sub-factor 1.2 by describing its current practices: "[w]e design," "we use," "we provide," "we implement blue-green deployment strategies," "we apply this approach to geospatial systems," "we utilize," etc. *Id.* As to its experience in the blue-green environment, CSI explained that:

> [a]t the EPA, cFocus implemented a cloud-based ArcGIS infrastructure emphasizing automation and repeatability. Our team leveraged Infrastructure as Code (IaC) scripts to provision development and test environments in AWS on

[6] Plaintiff allows that CSI demonstrates experience in software development, but argues that "architecting" is distinct from "development" citing AR Tab 20c, 446. The record does not definitively show that the two terms have no overlap. *Id.*

> demand, enabling EPA geospatial teams to rapidly prototype new capabilities, test updates, and validate configurations without risk to production systems. For instance, during EPA's rollout of a national environmental monitoring application, our IaC-driven AWS sandbox environments allowed rapid testing and validation of new ArcGIS features and AWS services, significantly reducing deployment timelines.

*Id.* at 502–03.

Plaintiff argues that CSI did not demonstrate experience with blue-green environments. A review of the excerpt above, however, shows that this was not the case. Indeed, the agency considered this element a strength of CSI's proposal. In addition, while plaintiff also believes that the agency failed to credit ASET's proposal more highly than it should, that sort of weighing of the agency's review of technical strengths and weaknesses is the prototypical "minutia of the procurement process," which the court will not second guess. *E.W. Bliss Co.*, 77 F.3d at 449. We may "not second guess" DHS' weighting of CSI and ASET's relative ability to provide blue-green environments. *Id.*

Plaintiff's last contention under Factor 1 relates to sub-factor 1.6. It argues that CSI did not show any experience using Agile methodologies. That sub-factor required CSI's quote to "[d]emonstrate[] ability to use agile methodologies for multiple teams." AR Tab 20c, 447. Plaintiff argues that CSI again only offers a proposal for what it would do in the future with regard to Agile methods. *See* AR Tab 22a, 508. ASET contends that the use of the present and future tense in CSI's proposal does not describe experience. Thus, plaintiff asserts CSI has not demonstrated experience under sub-factor 1.6.

Here too ASET unnecessarily narrows CSI's quote—cFocus did cite an instance of prior performance. The quote outlines services provided to the Defense Intelligence Agency where CSI "adopted Agile for application development and integrated it with that agency's stage gate reviews." AR Tab 22a, 508. While ASET may disagree with DHS' assessment of CSI's experience with Agile methodologies, we may not disturb the agency's decision on those grounds. *See E.W. Bliss Co.*, 77 F.3d at 449. In sum, for all three sub-factors plaintiff takes issue with under Factor 1, we find no error. DHS's conclusions about DCS's demonstrated experience.

II. Did DHS Properly Evaluate CSI's Management Approach?

Plaintiff next contends that DHS treated ASET unequally compared to CSI when evaluating their respective staffing levels under Factor 2: Management Approach. Plaintiff argues that CSI made an important mistake when it initially promised to provide names for twenty-three vetted employees, AR Tab 22a, 504, but produced nineteen at most, *id.* at 514–15.[7] Despite this, DHS had "increased confidence" in CSI's staffing plan. *See* AR Tab 27, 678. DHS justified its rating in the face of the discrepancy stating, "[w]hile this appears to be a minor inaccuracy, it does not materially affect the ability to meet the SOW requirements." AR Tab 56, 875. Plaintiff contends this was not a small error but a 22% deviation from what CSI promised to provide. Pl. Reply, 23 (ECF No. 37). Plaintiff argues that CSI, therefore, failed demonstrate the "full staffing approach" required by the RFQ. AR Tab 20c, 447.

This is an incorrect conception of the task before the TET. Its task was to judge whether a quoter could "resource all positions at the time of contract award." AR Tab 20c, 447. The RFQ notably did not require a minimum number of staff. *Id.* at 446–48. The agency was aware of the discrepancy in naming 19 of 23 individuals and judged it to be a minor inaccuracy. This was not arbitrary. The four individuals not named were optional for the project. CSI initially promised four people to work on the "Surge Support" task—a possible project that was optional. AR Tab 22a, 515. Those four people were not included in its eventual staffing plan deliverable, drawing down the total number of named individuals to nineteen. *Id.* Plaintiff concedes as much. Pl. Reply, 25–26 (ECF No. 37). Thus, DHS' decision to overlook this "minor inaccuracy" was not contrary to the RFQ and was not capricious. DHS did not "entirely fail[] to consider an important aspect of the problem, offer[] an explanation for its decision that runs counter to the evidence before the agency," and the action is not so "implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. DHS properly evaluated CSI under Factor 2 as well.

Under Count IV, ASET argues DHS should have treated plaintiff similarly to CSI when it assigned "increased confidence" to CSI for

[7] Plaintiff alleges it may be as few as eighteen names because the last individual was not fully vetted. Pl. Reply, 22 (ECF No. 37) (citing AR Tab 22a, 515).

submitting nineteen named staff but did not do the same for ASET which had identified fifteen employees. AR Tab 21a, 474–76. There were material differences, however. Unlike CSI's proposal, AR Tab 22a, 514–515, ASET's quote did not connect the individuals it submitted to specific labor categories, *compare* AR Tab 21a, 474, *with* AR Tab 2d, 101 (native) (listing labor categories). Thus, ASET's proposal is not "substantively indistinguishable [from] or nearly identical" to CSI's quote. *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (quotation omitted). Plaintiff's argument under Count IV fails.

III. Did DHS Err By Keeping CSI's "High Confidence" Rating for Factor Three Despite CSI Proposing Changes in Key Personnel?

Plaintiff's final contention revolves around CSI's proposed changes to key personnel after the initial award on September 29, 2025.[8] ASET argues that, in light of CSI's request to substitute personnel during the reevaluation period, DHS only had two options: (1) evaluate the proposal without the benefit of the personnel basis and reject it as technically unacceptable; or (2) open discussions for all offerors and permit the replacement of the not previously named key personnel, citing *Chenega Healthcare Servs., LLC v. United Staes*, 138 Fed. Cl. 644, 652 (2018). S*ee also PAE Applied Techs., LLC v. United States*, 153 Fed. Cl. 573, 578–79 (2021). Here, plaintiff contends that the key personnel CSI proposed in August were no longer valid because CSI asked to replace them. Because the RFQ did not permit discussions with all offerors, plaintiff contends the only alternative left for DHS would be to reject CSI's application. Because Aset was runner-up in the agency's evaluation, Aset argues it had a substantial chance at being awarded the business had DHS followed the *Chenega* rule.

This challenge's difficulty is that it targets events after contract award, which occurred on September 29, 2025. This argument turns on whether or not CSI was the awardee in October 2025 when it requested to substitute key personnel. We may only render judgment in bid protests on three distinct grounds: (1) pre-award protests; (2) post-award protests; or (3) any "alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Claims associated with "the adjustment or interpretation of contract terms, or other relief relating to the contract" are governed by the Contract Disputes Act. *Todd Constr. L.P. v.*

[8]ASET withdrew its argument in Count V that DHS erred in evaluating ASET's personnel under Factor 3. Pl. Reply, 1 n.1 (ECF No. 37).

*United States*, 656 F.3d 1306, 1311 (Fed. Cir. 2011) (quoting 48 C.F.R. § 2.101).

Here, the SOW permitted the awardee to request changes to key personnel. AR Tab 36, 759–61. On October 16th and 17th, 2025, CSI requested substitutions and in December 2025, the CO approved the requests. AR Tab 53, 851. At all relevant points during this reevaluation period, CSI was the awardee, and, for aught that appears, was performing. It was admittedly confusing for the CO to reconfirm the award after her internal reevaluation, but the fact remains that the award took place prior to the requested personnel changes. Requesting personnel changes after performance begins is not a problem. Thus, because CSI's request and DHS' subsequent approval were merely matters of contract administration, CSI's requests to substitute personnel fall outside our "bid protest jurisdiction." *MSC Indus. Direct Co. v. United States*, 140 Fed. Cl. 632, 651 (2018).

Even if the requested substitutions were not matters of contract administration, DHS did not act arbitrarily by using CSI's initial key personnel during reevaluation. For that review, the RFQ did not require DHS to consider information outside of the initial quotes—information such as the requests for substitution. *See generally* AR Tab 20c. Moreover, plaintiff has not shown that CSI's initial key personnel were unavailable. "[K]ey personnel are unavailable when they are, in fact, no longer working with their employer." *KPMG LLP v. United States*, 166 Fed. Cl. 588, 597 (2023) (citing *Orion Int'l Techs. v. United States*, 66 Fed. Cl. 569, 575 (2005) (explaining that a key staff member was unavailable because he was hired by the government), *aff'd*, 185 F. App'x 966 (Fed. Cir. 2006). There was no indication that CSI's substitutions were caused by unavailability. *See generally* AR Tabs 49–52. *Chenga* and its progeny only apply if "an offeror is *obliged* to make a change in the key personnel included in its proposal," 138 Fed. Cl. at 652 (emphasis added), not if a substitution is made because of convenience or to improve contract performance.[9] Therefore, plaintiff cannot clear the high bar of irrationality as to Factor 3 because it has not demonstrated DHS' exceeded its "broad discretion." *Tyler Constr. Grp. v. United States*, 570 F.3d 1329, 1334 (Fed. Cir. 2009).

---

[9] Intervenor cFocus asserts that the *Chenga* rule was invalidated recently. *Golden v. United States*, 157 Fed. Cl. 680 (2022). We need not reach this contention because this argument is deposed of on other grounds.

CONCLUSION

Plaintiff has not shown that the agency violated a regulation, procurement statute, or acted arbitrarily in awarding intervenor the subject contract. The government's evaluation of the technical and management elements of intervenor's and plaintiff's proposals were rational. Plaintiff's arguments represent mere disagreements as to the relative merits of proposals, something that is beyond our purview. Nor was the agency under a legal duty to inquire further regarding the availability of intervenor's key personnel at the time of award or during its "reevaluation" because there was no demonstrated unavailability. Accordingly, the Clerk of Court is directed to enter judgment for defendant. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge